# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-4060

_____

United States of America,      \*

         \*

       Appellant,     \*

         \*     Appeal from the United States

   v.                 \*     District Court for the

         \*     Eastern District of Missouri.

Christopher Carpenter,     \*

         \*

       Appellee.     \*

_____

Submitted:  May 16, 2006

Filed:  September 18, 2006

_____

Before LOKEN, Chief Judge, MELLOY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

The government appeals an order of the district court granting Christopher Carpenter's motion to suppress evidence. *See* 18 U.S.C. § 3731. We reverse and remand for further proceedings.

### I.

According to the facts as found by a magistrate judge in a report and recommendation and adopted by the district court, on December 18, 2001, Deputy David Rightnowar of the Phelps County, Missouri, Sheriff's Department was

operating a ruse drug checkpoint on Interstate Highway 44 near the Sugar Tree Road exit in Phelps County. He placed a sign reading "Drug Enforcement Checkpoint Ahead 1/4 Mile," on each side of the eastbound lanes of Interstate 44, approximately 200-300 yards before the Sugar Tree Road exit ramp. A short distance further east, but still before the exit, he placed two more signs labeled "Drug Dogs In Use." Deputy Rightnowar parked his marked police car so he could observe eastbound vehicles exiting onto Sugar Tree Road. Although there was no actual checkpoint, Deputy Rightnowar was "watching for any nonlocal traffic that would exit the interstate" and trying "to get reason to stop them." He explained that "if they were nonlocals, why, we would try to find out what they were doing up there." Deputy Rightnowar considered "nonlocal" traffic to be cars he didn't recognize, or those with out-of-state license plates.

Carpenter was driving eastbound on Interstate 44 at around 4:00 p.m. in a white Chevrolet Blazer, traveling from Texas to New York, and carrying a quantity of cocaine. After seeing the signs, Carpenter exited at Sugar Tree Road and drove south on County Road 7300. Because his car was low on gas, he decided to look for a service station. Deputy Rightnowar observed the Blazer exit Interstate 44 and turn onto the county road. Because the vehicle "just didn't look right for the area," he decided to follow it.

As Carpenter drove down the road, he realized there were no services at the exit, and when he looked in his rear view mirror, he saw that a police car was following him. Concerned that he had "driven into a trap," he decided to make a U-turn and pulled onto the side of the road. Deputy Rightnowar rounded a curve and saw Carpenter's Blazer parked on the side of the road. Deputy Rightnowar pulled off the road behind the Blazer, activating the emergency flashing lights on top of his police car as he did so.

-2-

Rightnowar approached the Blazer and asked Carpenter if he was lost, to which Carpenter responded in the negative. Carpenter then offered that he had exited the highway looking for a gas station, but said that when he realized there were none in the area, he had intended to turn around and get back onto the highway. Rightnowar thought this was suspicious, as there are no gas stations at the Sugar Tree Road exit, but such services are available at nearby exits. From the highway, there are blue signs indicating the presence of a motel and a campground at Sugar Tree Road, but otherwise the area is mostly rural.

Rightnowar inquired as to Carpenter's destination, and Carpenter replied that he was traveling from Austin, Texas, to New York. The deputy then asked to see Carpenter's license and registration, and Carpenter provided his Texas driver's license, along with paperwork indicating that the car was a rental vehicle. At some point in the conversation, Rightnowar leaned into the Blazer and saw that the gasoline gauge indicated the vehicle had a quarter of a tank of gas. He also noticed that Carpenter appeared nervous, as he could see an artery in his neck pulsing.

Deputy Rightnowar took Carpenter's license and the rental papers back to his patrol car, where he remained for four or five minutes. In examining the papers, he noticed that the rental agreement indicated that the vehicle had been rented in El Paso, rather than Austin. Rightnowar again walked over to Carpenter's vehicle and asked him what was in the cargo area of the Blazer. Carpenter replied that there were boxes of tile in the vehicle. When Rightnowar asked to look in the boxes, however, Carpenter asked if there was a problem with his license and told Rightnowar that "the boxes were all packaged up and he didn't see why the deputy needed to look inside them." At this point, Rightnowar told Carpenter that he had exited the highway at a drug interdiction area, that he believed Carpenter had exited to avoid the drug checkpoint, that he thought Carpenter had drugs in the car, and that, if Carpenter would not consent to a search, he would call a nearby officer with a drug dog.

Carpenter refused to consent to a search, and the deputy asked him to step out of the vehicle and patted down Carpenter's shirt and pants pockets in a search for weapons.

Sheriff Don Blankenship, who had been parked nearby on the north side of the highway with a trained drug detection dog in his vehicle, arrived and walked the dog around the outside of the Blazer. The dog alerted, and Deputy Rightnowar searched the Blazer. When he opened the boxes in the rear cargo area, he discovered bundles wrapped in plastic. Using his pocket knife, the deputy slit open one of the bundles and found it to contain a white powder that he believed was cocaine. Rightnowar then arrested Carpenter.

Carpenter was charged with one count of possessing with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(A). He moved to suppress the evidence, arguing that he was seized without reasonable suspicion, and that the discovery of the cocaine was the fruit of an unlawful seizure. A magistrate judge recommended to the district court that it grant Carpenter's motion, finding that Carpenter was seized "when Deputy Rightnowar took the defendant's driver's license and rental documents and went back to his patrol car" or "by the time Deputy Rightnowar told the defendant that he suspected that he possessed drugs and asked him to get out of his car." The magistrate judge concluded that the facts and circumstances existing at the time of the seizure did not give rise to a reasonable suspicion justifying the search of the vehicle, in part because "the fact that the defendant exited the highway at the exit where the checkpoint signs were located can play no part in any reasonable equation."

The district court determined that "the facts as found by the magistrate judge are fully supported by the evidence adduced at the suppression hearing." The court then ruled that the judge was correct in concluding "that a Fourth Amendment seizure of the defendant occurred either when Deputy Rightnowar took the defendant's driver's license and car rental documents to his patrol car or when the officer told the

defendant that he suspected him of carrying drugs and asked him to get out of his vehicle," because "it was at either point that a reasonable person would not have felt free to leave."

The district court reasoned that Carpenter's act of exiting the highway at the location of the drug checkpoint signs, standing alone, did not establish reasonable suspicion. The court formulated the dispositive question as "whether reasonable suspicion can be found to exist when that behavior is considered with other facts and circumstances known to Deputy Rightnowar at the time." Relying heavily on *United States v. Yousif*, 308 F.3d 820 (8th Cir. 2002), which held that a driver was seized without reasonable suspicion after exiting a highway in advance of a ruse drug checkpoint, the court ruled that Carpenter was seized in violation of the Fourth Amendment. We review the district court's legal conclusions *de novo* and its findings of fact for clear error. *United States v. Williams*, 359 F.3d 1019, 1020 (8th Cir. 2004).

II.

An encounter between citizens and police does not trigger Fourth Amendment scrutiny unless "it loses its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id*. A seizure does not occur "simply because a police officer approaches an individual and asks a few questions," so long as "a reasonable person would feel free to disregard the police and go about his business." *Id*. at 434 (internal quotation omitted). Even when officers have no basis for suspecting a particular individual, they may generally ask the individual questions and request to examine his or her identification. *Id.* at 435.

The district court concluded that Carpenter was seized either when Deputy Rightnowar took the defendant's driver's license and car rental documents to his

patrol car or when the officer told the defendant that he suspected him of carrying drugs and asked him to get out of his vehicle. Carpenter's principal contention is that he was seized at the earlier point, when Rightnowar took the driver's license and documents to his patrol car for four to five minutes. We conclude, however, that Righnowar's request for the identification and registration, and his brief retention of those documents, did not constitute a seizure.

A request to see identification is not a seizure, "as long as the police do not convey a message that compliance with their request[] is required." *Bostick*, 501 U.S. at 435. The district court found that Rightnowar "asked" to see Carpenter's license and registration, not that he ordered their production, so absent some other "message" of compulsion not present on this record, the deputy's request did not constitute a seizure. *Id*.; *United States v. Slater*, 411 F.3d 1003, 1006 (8th Cir. 2005); *United States v. McManus*, 70 F.3d 990, 992 (8th Cir. 1995). We have held that when a passenger voluntarily hands identification to an officer, the officer may reasonably consider that voluntary act as consent to a brief retention of the document for purposes of a "routine, thirty-second computerized records check, using equipment readily at hand." *Slater*, 411 F.3d at 1006. Rightnowar retained Carpenter's documents for four to five minutes while he examined them, and the record is unclear whether Rightnowar ran a computerized check, but we see no constitutionally significant distinction between this fact pattern and the situation in *Slater*. Rightnowar reasonably could interpret Carpenter's act of providing the documents as consent to retain them for brief examination or check, and the deputy's carrying of the license and rental papers to his vehicle did not effect a seizure.

The district court found that Rightnowar then "asked" Carpenter to exit his vehicle, which may not itself result in a seizure, *cf. United States v. Vera*, 457 F.3d 831, 835-36 (8th Cir. 2006), but Rightnowar also patted Carpenter down for weapons and told Carpenter that if he did not consent to a search, then the deputy would call a nearby officer with a drug dog. The government does not dispute that this

interaction constituted a seizure, but we conclude that Rightnowar at that point had reasonable suspicion of illegal activity sufficient to justify an investigative detention.

We consider the totality of circumstances in evaluating whether there was reasonable suspicion that criminal activity was afoot. *United States v. Arvizu*, 534 U.S. 266, 274 (2002); *United States v. Sokolow*, 490 U.S. 1, 8 (1989). Reasonable suspicion is a lower threshold than probable cause, *Alabama v. White*, 496 U.S. 325, 330 (1990), and it requires considerably less than proof of wrongdoing by a preponderance of the evidence. *Sokolow*, 490 U.S. at 7. The behavior on which reasonable suspicion is grounded, therefore, need not establish that the suspect is probably guilty of a crime or eliminate innocent interpretations of the circumstances. Factors consistent with innocent travel, when taken together, can give rise to reasonable suspicion, even though some travelers exhibiting those factors will be innocent. To justify a seizure, however, the officer must have a "minimal level of objective justification" and something more than an "inchoate and unparticularized suspicion or hunch." *Id.* (internal quotations omitted). And the ultimate test is not what the seizing officer actually believed, but "what a hypothetical officer in exactly the same circumstances reasonably could have believed." *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 n.4 (8th Cir. 2005) (quoting *United States v. Roggeman*, 279 F.3d 573, 581 n.5 (8th Cir. 2002)).

The district court determined that the facts of our decision in *Yousif*, 308 F.3d at 828-29, "compel the same analysis and conclusion" of an unlawful seizure in this case, but we believe that *Yousif* is readily distinguishable. That case involved ruse checkpoint signs that induced drivers to leave the highway at the Sugar Tree Road exit and then to encounter an actual checkpoint at the end of the exit ramp. Yousif exited the highway and then slowed down on the ramp when he observed the checkpoint ahead. We concluded that the use of a checkpoint that stopped every vehicle taking the exit was unreasonable under the Fourth Amendment, and that Yousif's conduct did not establish individualized reasonable suspicion. We said that the presence of

-7-

out-of-state license plates and travel on "a known drug trafficking highway" could not alone justify a stop. And our decision concluded that certain additional facts – that Yousif took an exit just past the ruse checkpoint signs, and slowed upon observing the actual checkpoint located on the exit ramp – were insufficient to justify a detention, in part because they "never would have arisen but for the existence of the illegal checkpoint." *Id.* at 829.

This case, of course, does not involve an illegal checkpoint at which all vehicles exiting the highway were stopped. Since *Yousif*, moreover, we have clarified that exiting a highway immediately after observing signs for a checkpoint "is indeed suspicious, even though the suspicion engendered is insufficient for Fourth Amendment purposes." *United States v. Williams*, 359 F.3d 1019, 1021 (8th Cir. 2004). In other words, Carpenter's act of exiting just after the checkpoint signs may be considered as one factor in the totality of circumstances, although it is not a sufficient basis standing alone to justify a seizure.

In this case, Carpenter drove a car with Texas license plates, exited just beyond the ruse checkpoint signs, and then parked off the road for no apparent reason. These factors at least begin to raise a reasonable inference that the driver may have departed the highway without a destination in mind because he was carrying drugs and wanted to avoid the purported checkpoint. *See United States v. Brugal*, 209 F.3d 353, 359-61 (4th Cir. 2000). The level of suspicion in this case was reasonably heightened when Carpenter claimed to be looking for a gas station, even though he had a quarter of a tank of gas and had taken an exit with no available services, despite signs on the highway indicating services at previous exits. *See id.* An officer reasonably could infer that Carpenter provided a false explanation to disguise his effort to avoid the checkpoint. When questioned about his travel plans, Carpenter appeared nervous to the deputy, and then explained that he was traveling from Austin, Texas, to New York, despite providing a rental agreement indicating his car had been rented in El Paso. This sort of discrepancy between documents and a driver's explanation is a

-8-

legitimate basis for suspicion, *see United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993); *United States v. Barbarena-Jimenez*, 77 F.3d 486, 1996 WL 83002, at * 2-3 (8th Cir. 1996) (per curiam) (unpublished), particularly where a reasonable officer could infer that Carpenter's explanation was an effort to distance himself from a known source city for drugs. *See United States v. White*, 42 F.3d 457, 460 (8th Cir. 1994) (noting that reasonable suspicion was supported in part by fact that defendant was traveling from El Paso, a known source city for drugs).

Some innocent travelers with a quarter tank of gas may leave a highway after drug checkpoint signs looking for fuel at an exit with no signs for services. And perhaps some of those innocent travelers will also be nervous when approached by police and even drive a vehicle rented in a drug-source city that is almost 600 miles from their stated point of departure. These circumstances, however, are sufficiently unusual and suspicious that they eliminate a substantial portion of innocent travelers, and provide reasonable suspicion to justify the brief detention of Carpenter for the purpose of conducting a dog sniff of the vehicle.

The district court's order granting Carpenter's motion to suppress evidence is reversed, and the case is remanded for further proceedings.

_____